739 A.2d 485

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**George Ivan LOPEZ, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 1998.

Decided Oct. 1, 1999.

Reargument Denied Nov. 19, 1999.

Eugene R. Mayberry, Slatington, for G. Lopez.

Theodore Racines, Allentown, Robert A. Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NIGRO, Justice.

On March 19, 1996, a jury found Appellant George Ivan Lopez guilty of the first-degree murder of David Bolasky and related charges.[1] Appellant had been tried jointly with co-defendant Edwin Romero, who was also convicted of the first-degree murder of David Bolasky. Following a sentencing hearing, the jury found that two aggravating circumstances and no mitigating circumstances had been established in connection with Appellant's participation in the murder of Mr. Bolasky.[2] Accordingly, the jury returned a verdict of death against Appellant. On April 17, 1996, the trial court formally imposed the death sentence against Appellant. This direct appeal followed.[3] For the reasons discussed below, we affirm the judgment of sentence.

For purposes of this appeal, the record below establishes the following relevant facts. On January 3, 1995, David Bolasky, an architect, went to an Allentown apartment building that he owned to collect rent from his tenants. Shortly after his arrival there, Mr. Bolasky was beaten, robbed, and strangled to death inside the third floor apartment of the building. On January 6, 1995, the police found Mr. Bolasky's van. The van had been wiped down, inside and out, in an effort to eliminate any latent fingerprints. Later that same day, the police found Mr. Bolasky's frozen body, wrapped in bed sheets, in the woods along a secluded road in Allentown. Upon unraveling the bed sheets containing Mr. Bolasky's

1. In addition to his conviction for the first-degree murder of David Bolasky, Appellant was convicted of robbery, 18 Pa.C.S. § 3901(a)(1)(i); theft, 18 Pa.C.S. § 3921(a); receiving stolen property, 18 Pa.C.S. § 3925; and criminal conspiracy, 18 Pa.C.S. § 903.

2. The jury found that the following aggravating circumstances had been established: first, David Bolasky was killed to prevent his testifying against Appellant, 42 Pa.C.S. § 9711(5); and second, the murder was committed during the perpetration of a felony, 42 Pa.C.S. § 9711(6).

3. Pursuant to 42 Pa.C.S. § 9711(h), this Court has automatic jurisdiction to review the trial court's judgment of a sentence of death.

body, the police discovered that his wrists and ankles had been hog-tied together. In addition, the twisted towel that Mr. Bolasky's murderers used to strangle him to death was found still wrapped around his neck. An autopsy revealed that Mr. Bolasky had been hit in the head with a blunt instrument prior to being strangled, and defensive wounds found on Mr. Bolasky's arms indicated that he had struggled to defend himself against the individuals who had attacked and murdered him.

Several weeks after the murder, Appellant's nephew, Miguel Moreno, made statements to the police incriminating himself, Appellant, Edwin Romero and George Barbosa in the robbery and murder of Mr. Bolasky. Based largely on Miguel Moreno's statements, the police obtained a warrant for Appellant's arrest. On January 21, 1995, the police found Appellant in Orlando, Florida.[4] At the time of his arrest, Appellant was discovered hiding in a closet with clothes piled on top of him. Following his arrest, he gave several statements to the police. Although Appellant initially denied any involvement in the robbery and murder of Mr. Bolasky [5], each of his successive

4. While the police attempted to locate and arrest Appellant and his cohorts, their ongoing investigation into the murder of Mr. Bolasky continued to yield important evidence linking Appellant to the crime. For instance, the police discovered that a nephew of Appellant's named Carlos Santiago pawned a watch, a man's ring, and two gold chains at a pawn shop in Jersey City, New Jersey, just three days after the murder of Mr. Bolasky. While the police were unable to recover the ring and the gold chains which Santiago pawned, they were able to recover the watch, which Mrs. Bolasky positively identified as having belonged to her late husband.

5. Four days after his arrest in Orlando, Appellant was interviewed by Detectives Joseph Hanna and Samuel Solivan of the Allentown Police Department. At that interview, Appellant denied having any knowledge of the Bolasky murder and insisted that he wasn't even in Allentown on the date that the murder occurred. Appellant was extradited to Pennsylvania shortly after his interview with Detectives Hanna and Solivan. Following his arrival in Pennsylvania, Appellant complained of shoulder pain and was taken by police to a hospital to have his shoulder examined. While he was at the hospital, Appellant told the officers accompanying him that he was 1300 miles away from Allentown at the time of the Bolasky murder, and that he had a notarized letter from Moreno which would exonerate him completely. Indeed, the police found a letter, purportedly from Moreno, in Appellant's jail cell in Florida which stated that Moreno had falsely accused Appellant of

statements to the police placed him closer to the crime, and evidenced a more intimate knowledge of the particular circumstances surrounding the killing.[6]

Appellant's joint jury trial with co-defendant Edwin Romero commenced on March 7, 1996. At trial, Miguel Moreno testified that on January 3, 1995, Appellant, Romero and Barbosa planned to rob and murder Moreno's landlord, Mr. Bolasky, after he collected the rent from his tenants.[7] According to Moreno's testimony, the group's initial plan was to rob Mr. Bolasky, then shoot him in the head in an alleyway adjoining the apartment building. However, when the men went to Moreno's third-floor apartment to await Mr. Bolasky's arrival, they abandoned their former plan, and instead instructed Moreno to lure Mr. Bolasky up to his apartment by offering to pay his rent, at which time Appellant, Romero and Barbosa would rob him.[8]

participating in the murder when he spoke to Detectives Joseph Hanna and Samuel Solivan. The letter, however, was later determined to be a fraud. In fact, at the time that Appellant was extradited to Pennsylvania from Florida, Moreno had never even met Detective Solivan, much less spoken to him about the murder of Mr. Bolasky. Appellant, on the other hand, had spoken with Detectives Hanna and Solivan while he was incarcerated in Florida, and had been given a copy of both detectives' business cards.

6. For instance, following his extradition to Pennsylvania, on February 5, 1995, Appellant told Detective Hanna that he knew that they were all guilty to some extent in connection with the murder, and that he knew that he would have to do some time, but for what he did, it wouldn't be much. Five days later, on February 10, 1995, Appellant agreed to a videotaped interview with Detective Hanna. During the course of that interview, Appellant told Detective Hanna that he was in Allentown on January 2, 1995, and that on that date, Moreno, Barbosa, and Romero hatched a plan to rob Mr. Bolasky in the alleyway adjoining his apartment building the following day. Appellant denied having any part in the robbery, but told Detective Hanna that on January 4, 1995, Barbosa, Romero and Moreno told him that they had robbed and killed Mr. Bolasky in Moreno's apartment.

7. Moreno had Nancy Roman, the first-floor tenant in Bolasky's building, call Bolasky to make sure that he was coming to collect rental payments that day. Moreno knew Nancy Roman because he lived with her sister, Lisette Roman.

8. Apparently, the men were afraid that Nancy Roman, the first-floor tenant, would hear the gunshots if they robbed and shot Mr. Bolasky in the alleyway adjoining the apartment building.

Moreno testified that he did as he was instructed, informing Mr. Bolasky that he had $700 in rent money to pay him. Moreno gave Mr. Bolasky approximately $350 and told him that the rest of the money was up in his apartment. Mr. Bolasky immediately made out a rent receipt for Moreno, and then followed him up to his apartment to collect the balance of the rent money. Unbeknownst to Mr. Bolasky, Romero and Barbosa were lying in wait for him in the bathroom of Moreno's apartment. Meanwhile, Appellant sat on Moreno's sofa, feigning indifference to Mr. Bolasky's arrival and pretending to watch television.

According to Moreno, he left his apartment as soon as Mr. Bolasky entered it. Moreno testified that he explained his sudden departure to Mr. Bolasky by telling him that he had to get change for a $100 bill. Moreno actually went downstairs to the first floor apartment of Nancy Roman, where he engaged Nancy and Lisette Roman in conversation in order to keep them from going upstairs and inadvertently interrupting the robbery. Approximately twenty minutes later, Moreno went back up to his apartment to see what was happening. When Moreno knocked on the door to his apartment, Appellant would not let him in, and told him that he did not want to see what had happened inside. Moreno testified that he went back downstairs and a few minutes later, saw Romero and Barbosa carrying Mr. Bolasky's body, tied and wrapped in bed sheets, down the stairs of the apartment building. Moreno also testified that he saw Appellant sitting in the driver's seat of Mr. Bolasky's white van out in front of the apartment building, and watched as Romero and Barbosa threw the body into the van. While Appellant, Romero and Barbosa drove off with Mr. Bolasky's body, Moreno went back up to his apartment and attempted to clean Mr. Bolasky's blood off of his floor.[9]

9. Physical evidence introduced by the Commonwealth at trial corroborated large portions of Moreno's testimony. For instance, the Commonwealth presented photographs which confirmed that Mr. Bolasky's body had been hog-tied and wrapped in bed sheets, just as Moreno's testimony indicated. In addition, the Commonwealth introduced into evidence at Appellant's trial the $700 rent receipt that Moreno testified

George Barbosa also testified at Appellant's trial. Prior to the trial, Barbosa gave a tape-recorded confession concerning his role in the murder of Mr. Bolasky to Captain Bucarey of the Somerset County Prosecutor's Office. In his confession, Barbosa also implicated Appellant, Romero and Moreno in the planning and execution of the murder. Barbosa specifically indicated that he and Romero hid inside Moreno's bathroom until Mr. Bolasky arrived, at which time he, Appellant and Romero robbed and assaulted him. Barbosa also confessed that he attempted to break Mr. Bolasky's neck with a string, and that when that failed, he wrapped a towel around Mr. Bolasky's neck and took turns with Appellant and Romero twisting it until Mr. Bolasky was dead. Barbosa stated that they wrapped Mr. Bolasky's body in bed sheets, carried it down the stairs, and placed it in Mr. Bolasky's van. Barbosa, Appellant and Romero then drove to a desolate area of Lehigh County, dumped the body, and abandoned the van. Following his confession, Barbosa pled guilty and received a life sentence.

On the witness stand at Appellant's trial, Barbosa testified that he gave Appellant two .38 caliber pistols, and that Appellant told him to go hide in the bathroom until Moreno lured Mr. Bolasky up to the apartment. When Mr. Bolasky entered the apartment, Barbosa came out of the bathroom and saw Appellant hit Mr. Bolasky on the head with one of the .38 pistols. Appellant then gave Barbosa some rope and told him that Mr. Bolasky had to be killed, or else Moreno would end up going to jail for the robbery and assault. Appellant told Barbosa to put the rope around Mr. Bolasky's neck and strangle him. Barbosa complied, but when he tried to stran-

Mr. Bolasky made out to him just before he was robbed and killed. The Commonwealth also presented testimonial evidence corroborating Moreno's testimony concerning the events leading up to Mr. Bolasky's murder. For instance, Nancy Roman's testimony corroborated Moreno's account of his activities while the murder was taking place. Nancy Roman testified that shortly before Mr. Bolasky arrived at his apartment building on January 3, 1995, Moreno told her that Appellant and two of his friends were hanging out upstairs in his apartment. In addition, Nancy Roman testified that Moreno asked her to call Bolasky on January 3, 1995 to make sure he was coming to pick up the rent that day.

gle Mr. Bolasky with the rope, it broke. At that point, Barbosa testified that Appellant ordered him to go to the kitchen to get something else with which to strangle Mr. Bolasky, and to get something with which to stab him in the neck in order to stop him from screaming. Barbosa returned with a towel and a small kitchen knife, and unsuccessfully attempted to cut Mr. Bolasky's throat with the knife. Barbosa then wrapped the towel around Mr. Bolasky's neck, and Appellant and Barbosa took turns twisting the towel until Mr. Bolasky was dead.

Barbosa testified that once Mr. Bolasky was dead, Appellant went through Mr. Bolasky's pockets and took his wallet, his wedding band, his jewelry, and the keys to his van. Appellant and Barbosa proceeded to tie Mr. Bolasky's body up, and wrapped it in bed sheets. While Barbosa finished wrapping up the body, Appellant went and got Mr. Bolasky's van. Barbosa testified that he dragged the body down the stairs, put it in the van and drove off with Appellant to dispose of it. After they dumped the body, Appellant parked the van, wiped away any fingerprints that they might have made inside the van and threw away Mr. Bolasky's briefcase and keys.

Barbosa further testified that, while he was incarcerated at the Lehigh County Prison, Appellant approached him and got him to agree upon a fictionalized account of their activities on the day that Mr. Bolasky was murdered (i.e., to get their stories straight). According to their agreed-upon story, Appellant and Barbosa were not involved in the actual robbery and murder of Mr. Bolasky, but only became involved after Moreno asked for their help in disposing of the body.

Noticeably absent from Barbosa's testimony at Appellant's joint trial with Romero was any testimony concerning Romero's participation in the killing. In fact, Barbosa flatly refused to answer any questions concerning Romero's involvement in the killing, despite the fact that his earlier confession to Captain Bucarey squarely implicated Romero in both the planning and the consummation of the robbery/murder. As a result, the trial judge held Barbosa in contempt of court, and granted the Commonwealth's request to have Captain Bucarey

read into the record those portions of the transcript of Barbosa's tape-recorded confession that implicated Romero in the commission of the murder of Mr. Bolasky.[10]

While Appellant was incarcerated in Lehigh County Prison awaiting trial, he developed an acquaintanceship with a fellow prison inmate named Daniel Lopez. Romero, Appellant's co-defendant, ended up being assigned as Daniel Lopez's cellmate. Eventually, Romero, Appellant, and even Barbosa confided in Daniel Lopez to some degree, and in doing so, implicated themselves in the commission of the robbery and murder of Mr. Bolasky. Thereafter, Daniel Lopez reported this incriminating information to the police.

Daniel Lopez testified in a bifurcated fashion at Appellant's trial—first against Appellant, and then against Romero. Daniel Lopez testified that Appellant had shown him a newspaper article concerning the Bolasky murder and had told him that he hit that man (Mr. Bolasky) once and knocked him out. According to Daniel Lopez, Appellant also told him that he could get away with the murder because he was very knowledgeable in the law. Finally, Daniel Lopez testified that Appellant wrote out a statement about his activities on the day of the murder and gave it to Romero to give to him with instructions to translate it into Spanish for Romero to read.[11] Daniel Lopez testified that the letter written by Appellant said that on the day of the murder, Appellant and several "other guys" went to the pizza shop near Moreno's apartment building. Appellant met Moreno at the pizza shop, but Moreno left the pizza shop and, a few minutes later, started arguing with

10. It should be noted that the Commonwealth presented substantial evidence that corroborated Barbosa's testimony and those portions of his confession that were read into the record at Appellant's trial. For instance, the Commonwealth presented evidence that Mr. Bolasky's body was found hog-tied and wrapped in bed sheets, with a twisted towel around his throat. In addition, the medical examiner who performed the autopsy on Mr. Bolasky confirmed that he sustained a blow to his head shortly before his death, and that the ultimate cause of death was strangulation by ligature. Finally, Barbosa's testimony corroborated, and was corroborated by, Moreno's earlier testimony.

11. According to Daniel Lopez's testimony, Romero was unable to read or write in English.

someone in the street. According to Daniel Lopez's testimony, the letter said that Moreno then came back to the pizza shop with a set of car keys and asked Appellant to go get a white van and bring it around to the front of the building. One of the "other guys" told Appellant that Moreno had a body in his apartment which he needed help with. Appellant and one of the "other guys" helped Moreno put the body in the van, and they drove off and dumped the body.[12]

[1–3] While Appellant does not challenge the sufficiency of the evidence, this Court is required in all cases in which a death sentence has been imposed to independently review the record to determine whether the Commonwealth has established the elements necessary to sustain a conviction for first-degree murder. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In conducting such a review, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as verdict winner to determine whether the jury could find that every element of the crime was proven beyond a reasonable doubt. *See Commonwealth v. Michael,* 544 Pa. 105, 109–12, 674 A.2d 1044, 1047 (1996). To obtain a conviction for first degree murder, the Commonwealth must prove beyond a reasonable doubt that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and that the killing was committed with deliberation. *See* 18 Pa.C.S. § 2502(a), (d); *Commonwealth v. Rios,* 546 Pa. 271, 281, 684 A.2d 1025, 1030 (1996), *cert. denied,* 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997). The specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another. *Commonwealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991).

12. Counsel for Appellant did not to object to the introduction of Daniel Lopez's testimony concerning the letter that Appellant asked him to translate into Spanish for Romero to read.

██ After reviewing the record, we find that there was sufficient evidence from which the jury could have found each element of an intentional killing beyond a reasonable doubt. *See* 18 Pa.C.S. § 2502(a), (d). The testimony of Moreno, Barbosa, and Daniel Lopez concerning Appellant's involvement in the planning, execution and covering up of the robbery and murder of Mr. Bolasky, coupled with the physical evidence and the other witnesses who corroborated their testimony, provide ample evidence to support this finding.

In the first claim of error presented in his appeal, Appellant argues that his trial counsel was ineffective for failing to object to Lehigh County's method for compiling its jury pool. This claim fails.

██ The law presumes that trial counsel was effective, and Appellant has the burden of proving otherwise. *Commonwealth v. Baez*, 554 Pa. 66, 110–12, 720 A.2d 711, 733 (1998). In order to prove that he was rendered ineffective assistance of trial counsel, Appellant must demonstrate that the underlying claim is of arguable merit, that his counsel had no reasonable basis for proceeding as he did, and that he was prejudiced by his counsel's ineffectiveness (i.e., there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness). *See Commonwealth v. Craver*, 547 Pa. 17, 22, 688 A.2d 691, 693–94 (1997) (citations omitted); *Commonwealth v. Howard*, 538 Pa. 86, 93, 645 A.2d 1300, 1304 (1994).

At the time of Appellant's trial, Lehigh County drew its jury pool from the list of licensed drivers in the county.[13] Appel-

13. Although Appellant does not argue that Lehigh County's method for selecting its jury pool violates 42 Pa.C.S. § 4521(a), the statutory section governing the selection of jury pools in Pennsylvania state courts, a review of the section nevertheless reveals that Lehigh County's method for selecting its jury pool is statutorily permissible. Section 4521(a) states that, in preparing a master list of prospective voters, "[t]he list shall contain all voter registration lists for the county, which lists may be incorporated by reference, or names from such other lists which in the opinion of the commission will provide a number of prospective jurors which is equal to or greater than the number of names contained in the voter registration lists." 42 Pa.C.S. § 4521(a). Appellant does not question the fact that, in 1996, Lehigh County's

lant claims that this selection method violated his Sixth Amendment right to an impartial jury trial because it left him with a jury panel that did not represent a fair cross-section of the community at large. Specifically, Appellant contends that Lehigh County's method for drawing its jury pool systematically excludes from jury service those individuals who are not licensed to drive, which includes large portions of the elderly, the poor and the handicapped.[14]

method for selecting its jury pool provided a greater number of prospective jurors than were contained in the county's voter registration list. According to the affidavits of the Lehigh County Administrative Court Operations Officer and the Chief Clerk to the Board of the Election and Registration Commission of Lehigh County (which the Commonwealth has appended to their brief to this Court as exhibits A and B), at the time of Appellant's trial in March of 1996 there were somewhere between thirty and forty thousand more individuals on Lehigh County's jury pool list than there would have been had the jury pool list simply consisted of those individuals registered to vote in the county. Accordingly, Lehigh County's method for selecting its jury pool was statutorily permissible pursuant to 42 Pa.C.S. § 4521(a).

14. In addition, Appellant argues that Lehigh County's jury pool selection method violated his right to be tried by a jury representing a fair cross-section of the community because it improperly conditions the right to serve on a jury on the privilege of obtaining a license to drive an automobile. An almost identical claim was raised by the defendant in *Commonwealth v. Cameron*, 445 Pa.Super. 165, 664 A.2d 1364 (1995). On appeal to the Superior Court following his conviction, Cameron raised a Sixth Amendment fair cross-section challenge to Lackawanna County's method for selecting its jury pool. At the time of Cameron's trial, Lackawanna County's jury pool consisted of all citizens eighteen years of age and older, who held a valid Pennsylvania Driver's License. Cameron argued that Lackawanna County's method for selecting its jury pool unfairly excluded African–Americans, plus large segments of the elderly, the poor, and the handicapped, and improperly conditioned the right to serve on a jury on the privilege of driving a motor vehicle. In dismissing Cameron's constitutional challenge, the Superior Court found that he failed to provide any substantiation for his allegation that Lackawanna County's jury selection process unfairly excluded African Americans, the elderly, the poor, or the handicapped. *Id.* at 175–76, 664 A.2d at 1369. In addition, the Superior Court found that Cameron failed to establish that Lackawanna County's jury selection process purposefully discriminated against individuals because of their race, age, economic status or various handicaps. *Id.* at 176, 664 A.2d at 1369. Finally, the Superior Court noted that while no practice for obtaining random lists of names for prospective jurors is foolproof, the "use of driver license registration lists appears to be more representative than most", because the possession of a driver's license is such a widespread and desirable privilege. *Id.* at 177, 664 A.2d at 1370.

■ In order for Appellant to make out a prima facie case that Lehigh County's jury pool selection system violates the Sixth Amendment's fair cross-section requirement for jury pool selection, he must show that 1) the group allegedly excluded is a distinctive group in the community; 2) representation of this group in the pool from which juries are selected is unfair and unreasonable in relation to the number of such persons in the community; and 3) the under-representation is due to the systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). In *Duren*, the United States Supreme Court stated that, in order to establish the second prong of the prima facie case, one "must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark of the Sixth Amendment fair cross-section requirement." *Id.*

■ Here, Appellant completely fails to make out the second prong of the prima facie case set forth in *Duren* as he offers absolutely no statistical proof that the elderly, the poor, or the handicapped are unfairly represented in Lehigh County's jury pool in relation to the number of such persons in the community. Appellant does not attempt to establish what percentage of the population of Lehigh County the elderly, the poor, and the handicapped constitute, nor does he offer any objective indication that any of these groups are under-represented in relation to their total numbers in the community. Accordingly, Appellant has not made out a prima facie case of a Sixth Amendment violation under *Duren.* Because Appellant has failed to show that his underlying claim of a Sixth Amendment fair cross-section violation has arguable merit, his trial counsel cannot be deemed to have rendered him ineffective assistance by failing to object to Lehigh County's method for selecting its jury pool. *See Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994)(counsel cannot be considered ineffective for failing to pursue a meritless claim)(citing *Commonwealth v. Durst*, 522 Pa. 2, 559 A.2d 504

(1989); *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985)).[15]

■ In his second claim of error, Appellant argues that his trial counsel was ineffective for failing to locate, contact and call certain alibi witnesses to testify at his trial. We disagree.

■ In order to prove that his trial counsel was ineffective for failing to locate and call alibi witnesses to testify on his behalf, Appellant must demonstrate that: 1) the witnesses existed and were available; 2) counsel was aware of the existence of the witnesses, or should have known of their existence and availability; 3) the proposed witnesses were ready, willing and able to testify on behalf of Appellant; and 4) the absence of the proposed testimony prejudiced him. *Commonwealth v. Hall,* 549 Pa. 269, 290–92, 701 A.2d 190, 201 (Pa.1997).

Here, Appellant asserts that prior to trial he gave his counsel the names of alibi witnesses who would have testified that he could not have murdered Mr. Bolasky, because he was at a bar in North Arlington, New Jersey called the 440 Club during the afternoon and evening of January 3, 1995. Appellant has appended several documents to his brief to this Court which appear to establish that the 440 Club existed in North Arlington, New Jersey as of the date that Mr. Bolasky was murdered. In addition, Appellant names two individuals, John Hindu and Teresa Hall, whom he asserts would have testified on his behalf that he was at the 440 Club when Mr. Bolasky was murdered in Allentown. However, Appellant fails, by

15. In a related argument, Appellant attempts to blame his failure to provide this Court with any statistical proof that the elderly, the poor, or the handicapped are systematically excluded from consideration for jury duty in Lehigh County on his trial counsel's alleged ineffective assistance. Appellant contends that if his trial counsel had made a timely challenge to the constitutionality of Lehigh County's jury pool selection process before the trial court, then he would have had an opportunity to make out a prima facie case under *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), at an evidentiary hearing. Appellant, however, fails to offer any indication whatsoever as to what sort of evidence he would have presented to support his constitutional challenge to Lehigh County's jury pool selection method had he been granted an evidentiary hearing by the trial court.

affidavit or otherwise, to provide any objective proof that John Hindu and Teresa Hall actually exist, or that they were ready, willing and able to testify on his behalf at his trial. As Appellant's trial counsel is presumed to have rendered him effective assistance, he will not be deemed ineffective for failing to call alibi witnesses based solely on Appellant's unsubstantiated allegations concerning the witnesses' existence and willingness to testify on his behalf. *See Commonwealth v. Copenhefer,* 553 Pa. 285, 308–10, 719 A.2d 242, 254 (1998). Therefore, Appellant is not entitled to relief on this claim.

▇▇▇▇▇ In his third claim of error, Appellant argues that his trial counsel was ineffective for failing to object to several portions of Daniel Lopez's testimony which he claims violated his confrontation rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and its progeny.[16] The first portion of Daniel Lopez's testimony that Appellant argues his trial counsel should have objected to concerns a conversation that he had with Romero about a handwritten statement that Romero wanted Lopez to translate into Spanish for him. The contested portion of testimony is as follows:

Q: (Commonwealth) Did you speak with [Romero] anymore about his case at that time?

A: (Daniel Lopez) Yes.

Q: What did you talk about?

A: He tell me that the other guy trying to make a statement, make just one statement altogether to not get confused in court.

---

**16.** Based on the Sixth Amendment right of confrontation, *Bruton* and its progeny prohibit the introduction during a joint trial of a non-testifying co-defendant's confession that expressly refers to the defendant. However, even if a non-testifying co-defendant's confession is redacted so that it does not expressly refer to the defendant, it may still run afoul of the *Bruton* rule. *See, e.g., Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998)(non-testifying co-defendant's confession which is redacted to erase all references to defendant's name violates *Bruton* rule if defendant's name has been replaced with obvious indications of deletions, such as blank spaces or the word "deleted").

Q: Now, at some point did you see that statement?

A: No, that was the first day that he made the statement the first day.

Q: Did you—did you ever see that statement that Mr. Romero had referred to?

A: Yes.

Q: Where were you when you saw that statement?

A: In my cell.

Q: Did Mr. Romero give that statement to you?

A: Yes.

Q: Was that statement in English or in Spanish?

A: In English.

Q: Why did Mr. Romero give it to you?

A: Because he—he don't write good and he don't speak good English. He don't understand it good.

Q: And he gave it to you for what reason?

A: He wanted me to translate it for him.

Q: Did you do that?

A: Yes, best I can.

Q: After you read that statement to him, what did you do with it?

A: I gave it to him back.

Q: Did he say anything about that statement after you read it to him?

A: He said he gonna give it to his lawyer.

Q: What was that statement? Can you tell the jury what that statement said pertaining to the murder of Mr. Bolasky and what Mr. Romero's involvement was?

A: Yes.

Q: As it pertains to Mr. Romero, what you read in that statement, can you now tell the jury what you read?

A: It's a statement that they came to Allentown January 2 to see—he came with the other guy to see his—the other guy brother for some business, stash of business. So, after that, they end up in a pizza place and they saw

Mr. Moreno on the other side of the street on the sidewalk argue with somebody and after that, he came back. Mr. Moreno came back with some set of key and gave it to him and ask him to—to get some white van that was from around the street somewhere. So, he saw when Lopez get the key and come out of the pizza shop and, um, said—he state that Lopez tell, um, Romero that wait for him front of the building and, um, after that, when he got in front of the building with the van, um, Romero and the other guy tell Ivan Lopez that his nephew got a body up there in his apartment.

Q: Okay. Now, let me stop you there and I want to back-up and discuss Mr. Romero's involvement only, okay. When Mr. Romero was in the pizza shop with the other guys, he said Miguel Moreno came to the—to them?

A: Yes.

Q: And that, eventually, Mr. Romero and the other guys went to 625 North Sixth Street?

A: Yes.

Q: Now, at some point in that statement that you read, Romero told you that he, meaning Romero, got in the van, the white van, with the other guys?

A: Yes.

Q: Okay. Did he tell you whether or not Miguel Moreno got into the van with them?

A: Yes, he tell me Moreno got into the van, the back seat.

Q: Okay. What—tell me again, or not again, but further in time in that statement that you read, what Miguel Moreno did after they drove away in the van?

A: They opened the door and Miguel Moreno dumped the body himself and he drove back to his apartment. He walk—he walk back to his apartment.

N.T., 3/12/96, at 148–52.

 Appellant argues that this portion of Daniel Lopez's testimony violated his confrontation rights because it referenced Appellant specifically by name and because it was

obvious to the jury that the "other guy" referred to by Daniel Lopez was Appellant. An examination of the merits of this argument, however, is unnecessary as Appellant completely fails to establish that he was prejudiced by the admission of the testimony.

As noted above, Daniel Lopez testified in a bifurcated manner at Appellant's trial. First, Daniel Lopez testified concerning his interactions with Appellant at the Lehigh County Prison. He then testified concerning his interactions with Romero at the Lehigh County Prison. The portion of Daniel Lopez's testimony that Appellant argues his trial counsel should have objected to came out while Lopez was testifying concerning his interactions with Romero. However, all of the testimony that Appellant now contests concerns a handwritten statement that Appellant himself wrote while he was in jail awaiting trial. In fact, when Daniel Lopez testified concerning his interactions with Appellant, he described how Appellant's handwritten statement came into his possession and gave an account of the contents of Appellant's handwritten statement. That account was essentially identical to the portion of his testimony to which Appellant now objects. *See* N.T., 3/12/96, at 124–28. Appellant does not contend that his trial counsel was ineffective for failing to object to Daniel Lopez's initial testimony concerning the contents of Appellant's handwritten statement. Therefore, Appellant can not demonstrate that he was prejudiced by his trial counsel's failure to object to the above-cited portion of Daniel Lopez's testimony, which is merely duplicative of his earlier recitation of the contents of Appellant's handwritten statement.

██ Moreover, a review of the record reveals that Appellant's trial counsel had a reasonable basis for not objecting to Daniel Lopez's testimony concerning Appellant's handwritten statement. Appellant's defense at trial was that he did not commit, or help to commit, the robbery and murder of Mr. Bolasky. Appellant's trial counsel recognized the fact that Daniel Lopez's testimony concerning Appellant's handwritten statement supported his defense that he had no part in the robbery and murder of Mr. Bolasky, and therefore took pains

to elicit the following testimony from Daniel Lopez on cross-examination:

Q: (Appellant's trial counsel) The four page handwritten statement that you had seen, you remember that pretty well?

A: (Daniel Lopez) (No response).

Q: Do you remember that statement pretty well, the content of that statement?

A: Yes.

Q: Okay. Did you see my client write it?

A: No.

Q: And in that statement, if what I understand from what you told this jury, my client indicated to you that Moreno came and got him out of the pizza shop, right?

A: Yes.

Q: And asked that he drive the van that belonged to Mr. Bolasky, right?

A: Yes.

Q: And Moreno had already killed Mr. Bolasky at that time, correct?

A: He didn't tell me that.

Q: Well, he said he needed help. Didn't the statement indicate to you that he required my client's assistance to help move the body?

A: Yes.

Q: So, didn't that—didn't you take that to mean that the body was already dead?

A: Yes.

Q: Yes. So, what the statement said, sir, and correct me if I'm wrong, a fair summary of the statement is that Moreno and maybe somebody else had killed Mr. Bolasky and then Moreno came and got my client to help them get rid of the body. Fair statement?

A: Yes.

N.T., 3/12/96, at 138–39.

During his closing argument, Appellant's trial counsel argued to the jury that the only portion of Daniel Lopez's testimony that they should believe was his testimony regarding the contents of Appellant's handwritten statement. *See* N.T., 3/19/96 at 48–50. Imploring the jury to accept as true Appellant's handwritten account of his activities on the day that Mr. Bolasky was murdered, counsel argued that while Appellant was a bad person for helping Moreno dispose of Mr. Bolasky's body, he was not guilty of the charge of first-degree murder. *See* N.T., 3/19/96, at 61–62. Thus, we find that Appellant's trial counsel had a reasonable basis for not objecting to Daniel Lopez's testimony concerning Appellant's handwritten statement—counsel chose to use the statement to support Appellant's defense that he only assisted in the disposal of Mr. Bolasky's body.

Since Appellant has failed to establish that his trial counsel had no reasonable basis for not objecting to the above-cited portion of Daniel Lopez's testimony or that he was actually prejudiced by the admission of the testimony, his instant ineffectiveness claim necessarily fails. *See Commonwealth v. Craver,* 547 Pa. 17, 22, 688 A.2d 691, 693–94 (1997); *Commonwealth v. Pierce,* 537 Pa. 514, 524, 645 A.2d 189, 194 (1994).

The second portion of Daniel Lopez's testimony that Appellant argues his counsel should have objected to came out while Lopez was testifying against Romero, and concerned a statement that Romero made to him regarding his activities around the time that Mr. Bolasky was murdered.[17] The portion of Daniel Lopez's testimony that Appellant argues his trial counsel should have objected to is as follows:

Q: (Commonwealth) Can you tell the jury what Edwin Romero told you about his own involvement in the murder of David Bolasky?

17. Romero asked Lopez to reduce his statement to writing so that he could give it to his lawyer.

A: (Daniel Lopez) It was the first sentence pretty much the same. At the other point they was in the pizza shop. He told me that he and, um, the other guy stay in the pizza shop, um, and Ivan Lopez and his nephew—

Q: No. What I want to talk about is, and I'm sorry for being—I don't mean to rude, what I'm concerned about is what Mr. Romero, okay, did only himself, okay.

N.T., 3/12/96, at 154–55.

■■■■ Appellant argues that the above-cited portion of Daniel Lopez's testimony constituted inadmissible hearsay, and that the specific reference to him violated his confrontation rights. However, Appellant fails to provide any cogent argument in support of his bald contentions. Nor does Appellant offer any indication as to how the above portion of Daniel Lopez's testimony prejudiced him or implicated him in the murder of Mr. Bolasky. *See Commonwealth v. Johnson*, 474 Pa. 410, 413, 378 A.2d 859, 861 (1977)(noting that the admission of a defendant's out-of-court statement during a joint trial only violates his co-defendant's right of confrontation if the statement has some incriminating impact). Finally, it is apparent that the above-cited portion of Daniel Lopez's testimony falls under the admission by party opponent exception to the hearsay rule. *See* Rule 803(25) of the Pennsylvania Rules of Evidence. As Appellant has failed to establish that this portion of Daniel Lopez's testimony constituted inadmissible hearsay or violated his confrontation rights, his trial counsel will not be deemed ineffective for failing to object to the testimony. *See Craver*, 547 Pa. at 22, 688 A.2d at 693–94; *Pierce*, 537 Pa. at 524, 645 A.2d at 194.

■■■ Appellant also argues, in summary fashion, that his trial counsel should have objected to the remainder of Daniel Lopez's testimony concerning the statement that Romero dictated to him, because Lopez repeatedly referred to what "the other guys" were doing around the time that Mr. Bolasky was murdered. In short, Appellant contends that the jury must have speculated that Appellant was one of the "other

guys" that Daniel Lopez mentioned during his direct examination, and that therefore the admission of the testimony violated his confrontation rights. However, possible speculation by the jury that Appellant was one of the "other guys" referred to by Daniel Lopez is not the measuring stick for determining whether or not a *Bruton* violation occurred. By the time of Appellant's trial in 1996, this Court had approved redaction as an appropriate method of protecting a defendant's confrontation rights under *Bruton*, and had interpreted *Bruton* as requiring that a co-defendant's incriminating out-of-court statement be redacted prior to its admission during a joint trial so that it "retains its narrative integrity and yet in no way refers to [the] defendant." *See Johnson*, 474 Pa. at 412, 378 A.2d at 860; *see also Commonwealth v. Miles*, 545 Pa. 500, 510, 681 A.2d 1295, 1300 (1996); *Commonwealth v. Lee*, 541 Pa. 260, 273, 662 A.2d 645, 652 (1995).

 A review of Daniel Lopez's contested testimony indicates that by using the term "the other guys" to refer to Romero's cohorts, he retained the narrative integrity of Romero's statement to him and avoided referring to Appellant. Therefore, under the law as it existed at the time of Appellant's trial, Daniel Lopez's testimony did not violate the *Bruton* rule.[18] As Appellant's contention that Daniel Lopez's testimony violated the *Bruton* rule lacks arguable merit, his instant ineffectiveness claim necessarily fails. *See Craver*, 547 Pa. at 22, 688 A.2d at 693–94; *Pierce*, 537 Pa. at 524, 645 A.2d at 194.

In his fourth claim of error, Appellant argues that his trial counsel was ineffective for failing to join an unsuccessful motion to suppress Daniel Lopez's testimony filed by his co-

18. We note that the United States Supreme court revisited the issue of the conditional admissibility of a non-testifying co-defendant's incriminating statement that implicates another defendant in *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). However, any impact that the *Gray* decision would have on our review of Daniel Lopez's testimony is immaterial, as counsel cannot be deemed ineffective for failing to anticipate a change in the law. *See Commonwealth v. Gibson*, 547 Pa. 71, 105, 688 A.2d 1152, 1169 (1997).

defendant Romero.[19] We disagree.

Romero's suppression motion argued that Daniel Lopez's testimony should be suppressed because he was acting as an agent of the Commonwealth when he obtained incriminating statements from Romero, Barbosa and Appellant at the Lehigh County Prison. In denying the motion, the trial court found that the authorities never solicited Daniel Lopez to obtain information concerning the Bolasky murder. Rather, believing it would benefit him at his sentencing, Daniel Lopez decided, on his own, to attempt to obtain incriminating statements from Appellant, Romero and Barbosa. In addition, the trial court found that Daniel Lopez was never promised any consideration in return for the information he obtained concerning the Bolasky murder. Accordingly, the trial court concluded that Daniel Lopez was not acting as an agent of the Commonwealth when he obtained incriminating statements from Romero, Appellant and Barbosa, and permitted him to testify at Appellant and Romero's joint trial. Based on our independent review of the record, we find that the trial court properly denied Romero's motion to suppress Daniel Lopez's testimony and therefore, that Appellant's instant ineffectiveness claim lacks arguable merit.[20]

In addition, we agree with the Commonwealth that Appellant's trial counsel had a reasonable basis for deciding not to join Romero's unsuccessful motion to have Daniel Lopez's testimony suppressed. As discussed above, Appel-

19. Barbosa had not yet pled guilty when Romero filed his motion to suppress Daniel Lopez's testimony, and joined in the motion.

20. In *Commonwealth v. Franciscus*, 551 Pa. 376, 710 A.2d 1112 (1998), this Court granted the defendant a new trial based on the admission of the testimony of a jailhouse informant which had been obtained in violation of the defendant's Sixth Amendment right to counsel. In so holding, the Court found that because the police agreed to testify on behalf of the jailhouse informant concerning his continuing efforts on their behalf, and because the police actively assisted the informant in his efforts to obtain incriminating statements from his fellow inmates, the jailhouse informant had been acting as an agent of the government when he obtained incriminating statements from Franciscus. In contrast to *Franciscus*, the authorities in the instant case made no promises to Daniel Lopez, and took no action to assist him in obtaining incriminating information from Appellant or any other inmates.

lant's defense centered around the four-page handwritten statement that he had Daniel Lopez translate into Spanish for Romero. In short, Appellant's handwritten statement indicated that he was totally unaware that Mr. Bolasky had been robbed and murdered until he agreed to assist Moreno in disposing of the body. Rather than have Appellant take the stand himself to testify concerning the contents of his handwritten statement, thereby putting his credibility and recollection of the events at issue, Appellant's counsel made a strategic decision to instead allow Daniel Lopez to testify concerning the contents of the handwritten statement.

Since Appellant has failed to establish either that his underlying claim has arguable merit or that his counsel had no reasonable basis for deciding not to join Romero's motion to suppress Daniel Lopez's testimony, he is not entitled to relief on this claim. *See Craver,* 547 Pa. at 22, 688 A.2d at 693–94; *Pierce,* 537 Pa. at 524, 645 A.2d at 194.

In his fifth claim of error, Appellant argues that the trial court abused its discretion and committed reversible error by denying his pre-trial motion to sever his trial from Romero's. Again, we disagree.

The decision whether to sever trials of co-defendants is within the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of that discretion. *Commonwealth v. Uderra,* 550 Pa. 389, 398–400, 706 A.2d 334, 339 (1998). The critical factor that must be considered is whether the accused has been prejudiced by the trial court's decision not to sever. *Id.* The accused bears the burden of establishing such prejudice. *Id.*

Appellant contends that he was prejudiced in several ways by the trial court's refusal to sever his trial from Romero's. First, Appellant argues that he was prejudiced because Barbosa refused to testify against Romero at the joint trial. Next, Appellant argues that he was prejudiced because Daniel Lopez's testimony concerning the statements that Romero made to him violated the *Bruton* rule. Finally, Appellant argues

that he was prejudiced because his joint trial with Romero served to confuse and mislead the jury.

 Appellant first contends that he was prejudiced by the trial court's refusal to grant his motion to sever because Barbosa, by refusing to testify against Romero at trial, somehow made Appellant appear more culpable than Romero in the eyes of the jury.[21] However, Appellant offers no indication as to how Barbosa's testimony, which squarely implicated Appellant in the murder of Mr. Bolasky, would have been any less damning to him had his trial been severed from Romero's. Appellant's second contention, that he was prejudiced as a result of the trial court's refusal to sever his trial because Daniel Lopez's testimony concerning the statements that Romero made to him violated the *Bruton* rule, is equally specious. As noted above, Appellant's defense at trial hinged on the admission of a large portion of the same testimony that Appellant now claims violated the *Bruton* rule and prejudiced him. In addition, we have determined that the remainder of Daniel Lopez's testimony did not violate the *Bruton* rule as it existed at the time of Appellant's trial.[22] With respect to

21. Appellant's assertion that Barbosa's refusal to testify against Romero made it appear to the jury that Appellant was primarily responsible for the murder of Mr. Bolasky is flatly contradicted by the fact that the jury convicted both Appellant and Romero of the first-degree murder of Mr. Bolasky.

22. Even if we were to assume arguendo that a portion of Daniel Lopez's testimony concerning the statements that Romero made to him violated the *Bruton* rule and implicated Appellant in the murder of Mr. Bolasky, such error was harmless and did not prejudice Appellant. Any evidence of Appellant's involvement in the murder of Mr. Bolasky that could be inferred from Daniel Lopez's testimony concerning Romero's statements was merely cumulative of other, properly admitted evidence indicating his guilt. *See Commonwealth v. Foy*, 531 Pa. 322, 327, 612 A.2d 1349, 1352 (1992)(where erroneously admitted evidence is merely cumulative of substantially similar, properly admitted evidence, harmless error doctrine applies, and defendant is not entitled to relief). Both Moreno's and Barbosa's testimony concerning the events on the day of the murder squarely implicated Appellant in both the planning and the commission of the crime. Furthermore, the Commonwealth presented substantial physical evidence that corroborated Moreno's and Barbosa's accounts of the murder. Thus, in light of the wealth of properly admitted evidence clearly establishing Appellant's guilt, any potential *Bruton* violation that might have occurred during the course

Appellant's final contention that he was prejudiced because his joint trial with Romero confused and misled the jury, Appellant fails to offer any explanation whatsoever as to how the jury was either confused or misled, or how the jury's supposed confusion worked to his prejudice.

Joint trials are advisable whenever defendants are alleged to have participated in the same series of acts or transactions and where conspiracy is charged. *Commonwealth v. Paolello*, 542 Pa. 47, 70, 665 A.2d 439, 451 (1995). That is exactly what transpired here. Therefore, absent any showing that Appellant was actually prejudiced by the trial court's refusal to grant his motion to sever, we find no abuse of discretion on the part of the trial court. *See Uderra*, 706 A.2d at 339; *Washington*, 547 Pa. at 557, 692 A.2d at 1021; *Commonwealth v. Lambert*, 529 Pa. 320, 331, 603 A.2d 568, 573 (1992)(trial court's decision to deny motion to sever will not be disturbed absent a strong showing of actual prejudice resulting from being tried jointly).

In his sixth claim of error, Appellant argues that the trial court abused its discretion and committed reversible error by permitting Barbosa to testify, and compounded its error by permitting the Commonwealth to read into the record those portions of Barbosa's tape-recorded confession that implicated Romero in the murder of Mr. Bolasky. We disagree.

Appellant's instant claim of trial court error is grounded in the notion that he was unable to effectively cross-examine Barbosa's direct testimony, because Barbosa refused to offer any testimony concerning Romero's participation in the murder of Mr. Bolasky. Appellant's claim is belied by the fact that his trial counsel conducted an extensive cross-examination of Barbosa, during the course of which he repeatedly questioned Barbosa concerning his differing accounts of the Bolasky murder and impugned his credibility by mentioning his prior criminal convictions. N.T., 3/15/96, at 72–98. In fact, the record reflects that Barbosa attempted to answer

of Daniel Lopez's testimony was merely harmless error. *See Commonwealth v. Washington*, 547 Pa. 550, 557, 692 A.2d 1018, 1021 (1997).

every question posed to him by Appellant's trial counsel during his cross-examination. Given the fact that Barbosa was available to be cross-examined by Appellant's trial counsel concerning his direct testimony, we find no abuse of discretion in the trial court's decision to permit Barbosa to testify at Appellant's trial.

In a related argument, Appellant contends that the trial court abused its discretion and committed reversible error by permitting the Commonwealth to read into the record those portions of Barbosa's confession that implicated Romero, and to admit the transcript of Barbosa's confession into evidence as an exhibit. This Court has previously held that the admission of Barbosa's confession as substantive evidence against Edwin Romero violated Romero's confrontation rights, since Barbosa was not available to be cross-examined concerning those portions of his confession that implicated Romero in the murder of Mr. Bolasky. *Commonwealth v. Romero*, 555 Pa. 4, 12–16, 722 A.2d 1014, 1018–19 (1998). However, even assuming arguendo that the admission of Barbosa's confession somehow violated *Appellant's* confrontation rights, Appellant is still not entitled to relief, because the erroneously admitted evidence could not have contributed to the verdict entered against him. *See Foy*, 531 Pa. at 327, 612 A.2d at 1352 (erroneous admission of evidence that is merely cumulative of substantially similar, properly admitted evidence constitutes harmless error, as it could not have contributed to the verdict).

Here, we find that any evidence of Appellant's involvement in the murder of Mr. Bolasky which could be extracted from the admission of Barbosa's confession was merely cumulative of other substantially similar, properly admitted evidence indicating his guilt. Barbosa's direct testimony concerning Appellant's involvement in the murder was completely consistent with the account of Appellant's involvement in the murder that he provided to Captain Bucarey by way of his confession. In addition, Moreno's testimony concerning the events on the day of the murder was consistent with Barbosa's testimony, and squarely implicated Appellant in both the planning and the

commission of the crime. Finally, as mentioned above, the Commonwealth presented substantial physical evidence corroborating Moreno's and Barbosa's testimony implicating Appellant in the murder of Mr. Bolasky. Given both Barbosa's and Moreno's properly admitted testimony, plus the corroborating physical evidence presented by the Commonwealth, any error in admitting Barbosa's confession was harmless, and will not serve as a basis for relief for Appellant. *See Romero,* 722 A.2d at 1019 (any error in admitting co-conspirator's confession was harmless where it was merely cumulative of co-conspirators' eyewitness testimony and corroborating physical evidence)(citing *Washington,* 547 Pa. at 556, 692 A.2d at 1021).

In his final claim of error, Appellant argues that his trial counsel was ineffective for failing to adequately prepare or present certain mitigating evidence during his penalty phase hearing. This claim fails.

During the penalty phase hearing, Appellant's counsel presented the testimony of Appellant's mother and brother, and tailored his argument to the jury in an effort to establish two distinct mitigating circumstances. First, Appellant's counsel attempted to establish the "catchall" mitigating circumstance enumerated at 42 Pa.C.S. § 9711(e)(8), by presenting evidence concerning Appellant's general background, as well as evidence that he had close emotional ties to his family. To that end, Appellant's counsel elicited testimony from Appellant's brother that Appellant was a hard worker, that he took care of his mother financially, that he was religious, and that he had a good relationships not only with his own eighteen year-old daughter, but also with his nieces and nephews. Appellant's counsel also elicited testimony from Appellant's mother that Appellant was religious, that he helped her out financially, and often paid for her air fare to come see him when he lived in Florida. Appellant's counsel also attempted to establish the mitigating circumstance enumerated at 42 Pa.C.S. § 9711(e)(7), that Appellant's involvement in the murder was relatively minor. To that end, Appellant's counsel argued to the jury during the penalty phase hearing that Barbosa was the individual who actually murdered Mr. Bolasky, and that

Moreno was the only individual who could have masterminded the plot to rob and kill his landlord.

Appellant's instant ineffectiveness claim centers around his contention that if his trial counsel had adequately prepared for the penalty phase hearing, he would have discovered that Appellant had trouble with blackouts as a child and young adult, and would have presented more evidence concerning Appellant's background and upbringing. However, Appellant completely fails to present any evidence in support of his bald allegation that he suffered from blackouts as a young man.[23] In addition, Appellant fails to offer any indication as to what sort of useful background information his trial counsel failed to provide the jury with during his penalty phase hearing, or how that information could have proven helpful to establishing the existence of the "catchall" mitigating circumstance.

Since Appellant fails to offer any support for his bald allegations that trial counsel was ineffective for failing to adequately prepare and present mitigating evidence and argument at his penalty phase hearing, he is not entitled to relief on this claim. *See Craver*, 547 Pa. at 22, 688 A.2d at 693–94.

Having concluded that Appellant's conviction for first-degree murder was proper, we are statutorily required to perform an automatic review of his sentence of death. Pursuant to this review, we must affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering

---

**23.** Indeed, even if we were to assume the truth of Appellant's assertion that he suffered from blackouts as a young man, he nevertheless offers no indication as to how that fact could have possibly changed the outcome of his penalty phase hearing.

both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).

On careful review of the record, we conclude that the sentence of death was not the product of passion, prejudice or any other arbitrary factor, but rather was based on the evidence that Appellant participated in the planning and execution of the premeditated killing of Mr. Bolasky during the robbery. We also conclude that the evidence was sufficient to support the finding of the two aggravating circumstances found by the jury. Finally, in terms of our duty to determine whether Appellant's sentence is excessive or disproportionate, we note that on June 25, 1997, the Governor of Pennsylvania signed legislation that removes such a proportionality review requirement for the death penalty statute. Act of June 25, 1997, No. 28 § 1 (Act 28). However, while Section 3 of Act 28 states that the Act shall take effect immediately, Act 28 is not applicable to the instant case as Appellant's death sentence was imposed prior to June 25, 1997. Thus, applying Act 28 to Appellant's case would result in an impermissible retroactive application of the law. *See Commonwealth v. Gribble*, 550 Pa. 62, 88–89, 703 A.2d 426, 439–40 (Pa.1997)(provisions of Act 28 removing proportionality review requirement from death penalty statute do not apply retroactively to death sentences imposed before June 25, 1997). Accordingly, we have independently reviewed Appellant's sentence in light of the sentencing data compiled by the Administrative Office of Pennsylvania Courts. *Id.* After considering both the circumstances of the crime and the character and record of Appellant, we conclude that his sentence of death is not excessive or disproportionate to the penalty imposed in similar cases.

Accordingly, we affirm the verdict and sentence of death.[24]

Justice SAYLOR files a concurring opinion in which Justices ZAPPALA and CAPPY join.

---

**24.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i)(Supp.1997).

SAYLOR, Justice, concurring.

I join the majority opinion, except for the conclusion that the form of redaction employed in connection with the testimony of Daniel Lopez would satisfy the dictates of the Confrontation Clause as interpreted in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), as well as the suggestion that the United States Supreme Court's decision in *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), represents a change in existing law.

It is evident that the district attorney perceived a *Bruton* problem in connection with Daniel Lopez's testimony, and particularly Daniel Lopez's description of the written statement which he claimed was passed from Appellant to his codefendant, Edwin Romero, in a prison cell (the "pizza shop story"). Thus, the prosecutor structured the Commonwealth's presentation of Daniel Lopez's testimony into a portion offered against Appellant and a separate portion offered against Romero. Further, the prosecutor instructed the witness to omit any references to Romero within the pizza shop story during his testimony against Appellant but instead to use the term "the other guy," and gave a similar instruction to replace references to Appellant during the portion of the testimony offered against Romero.

The problem with this technique of redaction, however, is that it was entirely transparent. The pizza shop story was repeated twice, once in each phase of the bifurcated presentation, with references to "the other guy" in one version often overlapping directly with references to the codefendants' names, thus rendering it patently obvious that the term "the other guy" was frequently employed to refer to Appellant.[1]

---

1. For example, Daniel Lopez opened his description of the pizza shop story during the portion of his testimony offered against Appellant by stating that:

 What I recall is that [Appellant] came to Allentown in January 2 to, um, to have some business with his brother, Angel. And by that time, he couldn't reach his brother and that he went to the pizza shop with the other guys.

 During the portion of his testimony offered against Romero, Daniel Lopez began the story as follows:

Indeed, Daniel Lopez was unable to maintain even this slim facade, but rather, contrary to instructions from the district attorney, referred to Appellant by name at several points during his testimony offered against Romero.

In my view, however, the Confrontation Clause was not implicated by the pizza shop story; thus, I see no need for this Court to endorse the flawed redactions, as they were not necessary in the first instance. First, while I find it a close question, I agree with the majority that the record is sufficient to support the conclusion that the pizza shop story was Appellant's own statement offered against him as an admission rather than the statement of another, such as would implicate the Confrontation Clause. To the extent that the record is ambiguous in this regard,[2] I note that the pizza shop story described a version of events that was inconsistent with the Commonwealth's theory of the case that Appellant was in the apartment where and at the time Mr. Bolasky was killed and physically participated in the murder (the pizza shop version would have placed Appellant in a pizza shop and had him participating only in the disposal of the body). The Commonwealth thus did not proffer the statement to prove the truth of the matter it contained; rather, it offered it as evidence of Appellant's consciousness of guilt by demonstrating his attempt to coach his codefendants into adopting a unified false statement in an effort to avoid criminal liability. In such

> It's a statement that they came to Allentown January 2 to see— [Romero] came with the other guy to see his—the other guy brother for some business, stash of business. So, after that, they end up in the pizza place. . . .

As another example, during the first rendition of the pizza shop story, Daniel Lopez referred to Miguel Moreno as Appellant's nephew, while during the second telling, he referred to Moreno as "the other guy's" nephew.

**2.** Daniel Lopez testified that he saw Appellant give the written statement to Romero, and that Romero described the statement as one which "the other guy" was trying to coordinate among all codefendants "altogether to not get confused in Court." Daniel Lopez did testify, however, that he did not witness Appellant writing the statement, and there is no testimony concerning a direct admission by Appellant that the written statement was actually his own. It is also significant that the pizza shop story itself contains multiple levels of hearsay.

circumstances, I would apply the principle that, when the government seeks to admit testimony concerning a codefendant's incriminating statement for some nonhearsay purpose, a defendant's right of confrontation is not generally implicated. *See generally Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985)(finding that a defendant's rights under the Confrontation Clause were not violated by the introduction of an accomplice's confession for the nonhearsay purpose of rebutting the defendant's testimony that his confession was coerced).

There has been some disagreement among courts concerning this point, described at length in *Lyle v. Koehler*, 720 F.2d 426 (6th Cir.1983), which involved facts similar to the present case (the government offered into evidence at a murder trial two letters circulated by a codefendant containing a fabricated alibi). The *Lyle* court noted that the letters were offered for a purpose similar to that for which the pizza shop story testimony was admitted in this case:

> [b]elieving the alibi to be false, the prosecution obviously did not seek to introduce the letters in order to demonstrate the truth of the particular statements they contained. Rather, the government intended to have the jury infer from the statements that [the author] was attempting to obtain fabricated alibi testimony, an act that revealed a "guilty mind" on his part regarding the shootings.

*Lyle*, 720 F.2d at 431. The court then described two lines of analysis concerning the hearsay nature of such statements. The first would simply treat the statement as nonhearsay, as it is offered not for the truth of the matter asserted but for another relevant purpose. The second would find that the chain of inferences that the jury is invited to make from the statement (i.e., the author needs a false alibi, because he has no explanation for his conduct consistent with his innocence, because he is guilty) is an integral part of the statement itself and thus should be included within the set of assertions made by the statement. Under this view, where the statement is proffered for the purpose of establishing consciousness of guilt, it would constitute hearsay. *See generally Lyle*, 720

F.2d at 432–33. While the *Lyle* court adopted the view that implied assertions of this sort fall within the definition of hearsay, I believe that the opposite conclusion is consistent with conventional hearsay analysis, the United States Supreme Court's decision in *Street,* and the Federal Rules of Evidence, *see* F.R.E. 801(c) & comment (indicating that, if a statement, although in assertive form, is offered as a basis for inferring something other than the truth of the matter asserted, the statement "is excluded from the definition of hearsay"), as well as our own rules of evidence. *See* F.R.E. 801(c) & comment. *See generally State v. Esposito,* 223 Conn. 299, 613 A.2d 242 (1992)(declining to adopt the broader view of hearsay taken by the majority in *Lyle* ).

Thus, I would find that Daniel Lopez's testimony concerning the pizza shop story was nonhearsay, and. I perceive no violation of Appellant's right of confrontation. In this regard, I note that it is not so important whether the record firmly establishes who physically prepared the written document— Daniel Lopez's testimony was offered for the purpose of demonstrating that Appellant was circulating a false account among his codefendants, and the record provides an ample foundation upon which his testimony could be admitted for such purpose.[3]

Finally, contrary to the suggestion contained in footnote 18 of the majority opinion, I view the United States Supreme Court's decision in *Gray* as a rational application of the

**3.** I must also respectfully disagree with the majority's alternative conclusion that trial counsel's failure to object to the testimony concerning the pizza shop story constituted a reasonable trial strategy, in that counsel utilized the story in his closing speech by imploring the jury to accept the version of the facts it contained. In my view, the introduction of the pizza shop story provided highly damaging evidence of Appellant's consciousness of guilt. The potential value of the story to the defense would seem to be insignificant in light of the highly suspicious context in which the story was related and absent any corroboration in the evidence whatsoever. Under the circumstances, I do not believe that a reasonable jury would ever accept the substance of such a statement, particularly in view of the extensive evidence of Appellant's guilt. Thus, if the statement had in fact been objectionable, I would find that trial counsel's failure to lodge an objection would have constituted ineffectiveness.

principles enunciated in *Bruton* rather than as a change in the law.

Justice ZAPPALA and Justice CAPPY join this Concurring Opinion.